**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 21-cv-02201-REB-SKC

ROSS KIMBALL and
LAUREN KIMBALL

      Plaintiffs,

v.

NATIONWIDE INSURANCE COMPANY OF AMERICA,

      Defendant.

---

## ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

**Blackburn, J.**

    The matters before me are (1) **Plaintiffs' Partial Motion for Summary Judgment** [#59],[1] filed September 28, 2022; and (2) **Defendant's Motion for Partial Summary Judgment** [#60], filed September 28, 2022.  I deny both motions.

## I.  JURISDICTION

    I have jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

## II.  STANDARD OF REVIEW

    Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  **FED. R. CIV. P.** 56(a); **Celotex Corp. v. Catrett**, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

---

[1] "[#59]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF).  I use this convention throughout this order.

(1986).  A dispute is "genuine" if the issue could be resolved in favor of either party.

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d

1131, 1135 (10th Cir. 1994).  A fact is "material" if it might reasonably affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of

a genuine dispute of material fact.  *Concrete Works, Inc. v. City & County of Denver*,

36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995).  By contrast,

a movant who will bear the burden of proof must submit evidence to establish every

essential element of its claim or affirmative defense.  *See In re Ribozyme*

*Pharmaceuticals, Inc. Securities Litigation*, 209 F.Supp.2d 1106, 1111 (D. Colo.

2002).  In either case, once the motion has been properly supported, the burden shifts

to the nonmovant to show, by tendering depositions, affidavits, and other competent

evidence, that summary judgment is not proper.  *Concrete Works*, 36 F.3d at 1518.  All

the evidence must be viewed in the light most favorable to the party opposing the

motion.  *Simms v. Oklahoma ex rel Department of Mental Health and Substance*

*Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S.Ct. 53 (1999).

That the parties have filed cross-motions for summary judgment does not

necessarily indicate summary judgment is proper.  *See Atlantic Richfield Co. v. Farm*

*Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *James Barlow Family*

*Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert.*

*denied*, 118 S.Ct. 1364 (1998).  "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."  **Buell Cabinet Co. v. Sudduth**, 608 F.2d 431, 433 (10th Cir. 1979).  Although the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties," each party has an independent obligation to satisfy its respective the burden of proof, and summary judgment will not be appropriate if genuine disputes of material fact remain.  **Atlantic Richfield Co.**, 226 F.3d at 1148 (citation and internal quotation marks omitted).

### III.  ANALYSIS

On November 14, 2019, plaintiffs Ross and Lauren Kimball entered into a contract with TBros Construction ("TBros"), owned by Brad Riviere, to undertake a substantial renovation of their kitchen, sun room, living room, and laundry area.  (**Plf. Motion App.**, Exh. C ¶ 4 at 1 & at 6-7.)  Under the terms of the contract, the acquisition of permits for the construction was not included in the scope of work.  It thus fell to the Kimballs "to secure necessary permits through Arapahoe County: homeowner's permit."  (*Id*., Exh. C at 6.)  Although the project start date was "contingent upon permitting approval" from the county, the contract also contemplated that "[t]his countersigned document serves as approval to move forward with Phase 1" of the project.  Phase 1 called for, *inter alia*, demolition of the kitchen and sun room floors.  (*Id.*)

The Kimballs applied for a permit from the county on December 13, 2019.  As she was completing the application, Mrs. Kimball texted Mr. Riviere,[2] to inquire about

_____

[2]  All text exchanges referenced herein involved Mr. Riviere and both Mr. and Mrs. Kimball.

the cost of materials, as she was planning to state – falsely – that she and Mr. Kimball were providing the labor for the renovation themselves.[3]  In addition, Mrs. Kimball falsely answered "'no' to the question 'do we have more than 32 square feet of demo' because that leads to an asbestos inspection."  (**Def. Motion App.**, Exh. D at 41.)  The contract itself plainly shows this representation to be false, as the plans for kitchen alone contemplated substantially more than 32 square feet of renovation.  (**Id.**, Exh. E at 7.)[4]

When Mrs. Kimball submitted the application, she was informed there would be a "4-6 week turn around" to secure the permit.  (**Def. Motion App.**, Exh. D at 41.)  In declarations filed in support of their motion for partial summary judgment, the Kimballs aver they insisted no demolition begin until permits were acquired.  (**Plf. Motion App.**, Exhs. C ¶¶ 7-8 at 2 at & D ¶¶ 6-7 at 2.)  However, although the Kimballs did express some hesitancy early on about beginning demolition without a permit (**see Plf. Motion App.**, Exh. D at 7), they allowed TBros access to the home as early as November 25,

---

[3]  By doing so, the Kimballs submitted a permit which suggested the total cost of their renovation was just $22,600, the cost of materials (**see Def. Motion App.**, Exh. D at 41), rather than the actual cost of the project, which was $98,400 (**see id.**, Exh. B at 8).  That representation likely slashed the price of the permit substantially.  (**See** Arapahoe County, *Remodel Guide, Residential Permit Application Submittal Requirements* ¶ 6 (fee calculator and fee schedule showing that cost of permits increases with cost of renovation) (available at:  https://arapahoegov.com/2328/Remodel-Guide) (last accessed:  April 9, 2023); **see also** Financial Samaurai, *Remodel With Permits Or Without Permits? A Cost Benefit Analysis, Building Permit Costs* (Jan. 8, 2023) ("Building permit costs are often usually a percentage of the remodel cost.") (available at:  https://www.financialsamurai.com/remodel-with-permits-or-without/) (last accessed: April 9, 2023).)

[4]  The Kimballs deny this clearly undeniable fact in their response to Nationwide's motion because the exhibit cited did not contain the referenced document.  Such gamesmanship will not be tolerated.  All counsel are reminded that "[i]n the American legal system a lawyer owes a duty of candor to the tribunal as an officer of the court," **In re Palantir Techologies, Inc.**, 2022 WL 2356298 at *17 (D. Colo. June 30, 2022) (citing Colorado Rule of Professional Conduct 3.3(a)(1)), which I construe to encompass a duty to acknowledge facts which cannot justifiably be contested.

2019 (*id.*, Exh. D at 9), discussed plans for Mr. Riviere to do electrical work at the house on December 2 (**Def. Resp. App.**, Exh. L at 3), allowed him to begin demolishing the kitchen ceiling some time between December 6 and December 9 (*see id.*, Exh. L at 3, 6-8), all before even submitting an application for a permit.  Thereafter, and knowing issuance of a permit would take four to six weeks, the Kimballs were aware that TBros dug an electrical trench (**Plf. Motion App.**, Exh. D at 9 (text exchange of December 18, 2019)), and they authorized Mr. Riviere to take up the laundry room flooring (*id.*, Exh. D at 27-28 (text exchange of December 20, 2019)).[5]

On December 31, Stanley Turner, the plans examiner, having noticed the obvious fact that the Kimballs' renovation plans contemplated more than 32 square feet of demolition,[6] inquired via email whether an asbestos test had been conducted and sent to the CDPHE "*for review and permit release*."  (**Def. Motion App.**, Exh. D at 13 (emphasis added).)  Mrs. Kimball forwarded this information to Mr. Riviere and asked if "this permit situation" effected the plan to proceed with demolition the following week (**Plf. Motion App.**, Exh. D at 31.)  She seemed incredulous that such a test was required, since "asbestos is a thing of 70 years ago."  (**Def Motion App.**, Exh. D at 42).

That supposition is not at all correct.  As noted on the very web page which contains the link to begin the permit application process, Arapahoe County follows

---

[5]  Also with the Kimballs apparent knowledge and assent, Mr. Riviere installed a charger for their Tesla on December 23.  (*Id.*, Exh. L at 9-10.)  Arapahoe County requires a permit for the installation of an electrical vehicle charger at a residential property.  (*See* Arapahoe County, *EV Charger Residential Permit Application Submittal Requirements* (available at:  https://www.arapahoegov.com/2319/EV- Charger) (last accessed:  April 9, 2023).)

[6]  He perhaps also noted the Kimballs' home was built in 1981 (*see* **Plf. Motion App.**, Exh. D at 32), which on its own required an asbestos inspection (*see* **Amend. Compl. App.**, Exh. 2 at 2).

Colorado Department of Public Health and Environment ("CDPHE") guidelines for asbestos testing and abatement.[7]  The CDPHE guidelines establish trigger levels for the requirement of asbestos testing in a single-family dwelling:  "50 linear feet on pipes; 32 square feet on other surfaces; or the volume equivalent of a 55-gallon drum." (**See Amend. Compl. App.**, Exh. 2 at 2.)  "If the structures/components to be disturbed exceed the trigger levels, they **must be inspected for asbestos** by a Colorado-certified asbestos building inspector, unless the building was built after October 12, 1988."  (**See id.**, Exh. 2 at 2 (emphasis in original).)  These inspection and testing requirements plainly were implicated both by the age of the Kimballs' home and the scope of the planned renovation.

In light of Mr. Turner's inquiry, on January 1 and 2, 2020, Mrs. Kimball and Mr. Riviere discussed obtaining an asbestos test kit at Home Depot.  (**Def Motion App.**, Exh. D at 187.)  Neither the Kimballs nor Mr. Riviere seem to have focused on that aspect of Mr. Turner's inquiry which plainly referenced the need for any asbestos test to be submitted to the CDPHE for review.[8]  (**Id.**, Exh. D at 13.)  Nor does it appear the Kimballs read the information for the asbestos test kit available at Home Depot, which plainly showed that any sample must be sent to a lab for analysis, with results typically

---

[7]  **See** Arapahoe County Public Works & Development, *Remodel Guide, Residential Permit Application Submittal Requirements* ¶ 1 (available at: https://www.arapahoegov.com/2328/ Remodel-Guide#:~:text=A%20Site%20Plan%2C%20if%20the%20proposed%20remodel%20includes,appl icable%20Roof%20truss%20calculations%20and%20layouts%2C%20if%20applicable) (last accessed: April 9, 2023).  This page provides a link to the county's permit guide, which then links to the CDPHE standards.  (**See** *Residential Remodel Building Permit Guide, Residential dwelling code compliance and mandatory requirements when remodeling, Asbestos* ¶ 2 at 5.)

[8]  Moreover, at no point did the parties ever discuss whether Mr. Riviere was a certified asbestos inspector.

available within seven days; even express analysis requires three business days for results.  (**Def. Resp. App.**, Exh. O at 12.)

Despite this information, and Mrs. Kimball's contemporaneous insistence that "[w]e better pass this test" (*id.*, Exh. L at 20), the Kimballs permitted Mr. Riviere entry to their home the following Monday, January 6, 2020, to continue the kitchen demolition, as he had indicated was his intent on January 1 (**Plf. Motion App.**, Exh. D at 31).  Mrs. Kimball asked Mr. Riviere to "[t]ake demo pics!!" and Mr. Kimball inquired as to "the rough timetable for work in January[:]  Electrical, plumbing, hvac, floors, etc."  After starting the demolition, Mr. Riviere informed the Kimballs there were "3 layers of vinyl flooring" in their kitchen.  Mrs. Kimball responded with a series of laugh/cry emojis and again asked Mr. Riviere to "[s]end pics!"  (**Def. Motion App.**, Exh. D at 18-19.)  The pictures Mr. Riviere sent in response clearly show demolition of the kitchen floor.  (**Def. Resp. App.**, Exh. L at 15.)

At 4:34 p.m. that afternoon, Mrs. Kimball asked (in addition to other questions) whether an asbestos test "had been conducted and sent to the CDPHE for review and permit release," as Mr. Turner had inquired a week earlier.  (**Def. Motion App.**, Exh. D at 20.)  Despite receiving no response to that question, two hours later Mrs. Kimball inquired about the "[p]lan for tomorrow?"  (*Id.*, Exh. D at 21.)  The following afternoon, Mrs. Kimball texted Mr. Riviere "[d]emo is awesome" and asked about the "[p]lan for rest of week."  (*Id.*, Exh. D at 42.)  As an apparent afterthought, she added, "Oh, need permit answers when you can."  (*Id.*, Exh. D at 42.)  Although the Kimballs now claim that once they discovered (at some unspecified time) that Mr. Riviere had failed to test

7

for asbestos, they demanded he have the home tested immediately (**Plf. Motion App.**, Exhs. C ¶ 11 at 3 & D ¶ 11 at 3), they continued discussing the renovation with Mr. Riviere and allowed TBros access to their home at least through January 23, when the results of the asbestos test were reported (*id.*, Exh. D at 38).

The house was inspected by a certified asbestos inspector on January 16.  (*Id.*, Exh. G at 2.)  The results showed the old vinyl flooring from the Kimballs' kitchen contained 15% chrysotile[9] and thus was positive for asbestos.  (*Id.*, Exh. G at 6.) Although the inspector characterized the damage to the home as a "major spill" (*id.*, Exh. G at 9-10), the state determined the exposure was only a "minor spill," which meant the Kimballs were not required to dispose of their personal property to abate the exposure (*see id.*, Exh. G at 41).  While the inspector himself chose not to revise his original opinion, he informed the Kimballs that

> [c]alling it a major spill or a minor spill has ZERO impact on what you may choose to do with your items, it is not dependent on spill classification.  No one cares what you choose to do with your items, it makes no difference to anyone, we are simply trying to tell you what you are required to do vs. what you may want to do.  I understand you have children and if you don't feel cleaning your items will be satisfactory, by all means, throw it all out, that is perfectly acceptable.  You just need to understand that would be your choice and not a requirement by anyone.

---

[9]  Chrysotile, or white asbestos, is the most common form of the five minerals that are collectively considered asbestos.  The Environmental Protection Agency was granted authority to regulate asbestos by the Asbestos Hazard Emergency Response Act of 1986, **CITE**.  (*See* Asbestos.com, *Types of Asbestos, Overview, Asbestos Types of AHERA Classification* ¶ 01 (available at: https://www.asbestos.com/asbestos/types/) (last accessed:  April 9, 2023).)

(*Id.*, Exh. G at 43.)[10]  Despite this information, the Kimballs chose to dispose of over $200,000 of personal items in their home.  (**Plf. Motion App.**, Exhs. C ¶ 16 at 5 & D ¶15 at 4.)

The Kimballs filed a claim with defendant Nationwide Insurance Company of America ("Nationwide") under their homeowners insurance policy.  They maintain the damage to their home is covered under the policy's vandalism or malicious mischief clause because TBros allegedly removed the tile in violation of the Kimballs' purported instructions to obtain an asbestos test first.[11]  Nationwide denied coverage and maintains the Kimballs' alleged damages are excluded under the policy.  This lawsuit, alleging claims for breach of contract and for statutory and common law bad faith breach of insurance contract, followed.

The motions presently before me are limited to the issue of coverage.[12]  Although

---

[10]  If the inspector seemed brusque in this exchange, it appears to have been in response to the Kimballs' insinuation that his "decision to change the classification is based on influence from the contractor."  (**Def. Motion App.**, Exh. G at 42.)

> The reason my opinion is echoing [the contractor] is because it is the logical one.  You can choose to do voluntary abatement and disposal above and beyond any regulation.  But your logic is flawed, keeping items and having them cleaned and present [sic] for clearance testing would make it HARDER to pass clearance testing than if they were not present at all.

(*Id.*, Exh. G at 44.)

[11]  In its motion, Nationwide suggests the Kimballs seek coverage for the loss of their personal property only.  (**Def. Motion** at 1.)  However, it is not clear the claims herein are so limited, as the Amended Complaint prays for "the full costs incurred" as well as consequential damages.  (**Amend. Compl.** ¶¶ 67-68 at 7.)

[12]  For reasons not apparent from the record, the magistrate judge conceded to the parties' proposal to bifurcate discovery and summary judgment briefing.  It is not at all clear to this court why this case – involving the typical trinity of claims asserted routinely in breach of insurance contract cases – merited the additional layer of complexity and delay which attend bifurcation of discovery and presentation of claims, as has occurred here.

that issue is one of law for the court to resolve, *see Allstate Insurance Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002), my determination hinges on the credibility of the Kimballs' assertions in their summary judgment declarations that they expressly instructed TBros not to proceed with removal of the floor tile.  Because those averments are not plainly supported – indeed, seem to be contradicted – by the contemporaneous evidence of the Kimballs' interactions with Mr. Riviere, I cannot resolve the issue of coverage at this juncture.

Under Colorado law, which governs in this diversity case, *see Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *James River Insurance Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011), an insurance policy is a contract and thus is to be interpreted according to principles which govern contracts generally, *see Huizar*, 52 P.3d at 819; *Chacon v. American Family Mutual Insurance Co.*, 788 P.2d 748, 750 (Colo. 1990).  As with all contracts, the primary goal in interpreting the contract of insurance is to effectuate the intent of the parties.  *Union Insurance Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994); *Simon v. Shelter General Insurance Co.*, 842 P.2d 236, 239 (Colo. 1992).

To accomplish this objective, the terms of the policy are given their plain and ordinary meanings unless the policy itself indicates the parties intended otherwise. *Bohrer v. Church Mutual Insurance Co.*, 965 P.2d 1258, 1261-62 (Colo. 1998); *Chacon*, 788 P.2d at 750.  Policy provisions which are clear and unambiguous must be enforced as written, *Chacon*, 788 P.2d at 750; *Kane v. Royal Insurance Co. of America*, 768 P.2d 678, 680 (Colo. 1989), and strained constructions should be

avoided, *Huizar*, 52 P.3d at 819; *Allstate Insurance Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990).  While terms which are truly ambiguous must be construed in favor of the insured, *see Pompa v. American Family Mutual Insurance Co.*, 520 F.3d 1139, 1141 (10th Cir. 2008), a term is only ambiguous when it is reasonably susceptible to multiple interpretations in the context in which it is used, *Terranova v. State Farm Mutual Automobile Insurance Co.*, 800 P.2d 58, 60 (Colo. 1990).  Accordingly, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement."  *Radiology Professional Corp. v. Trinidad Area Health Association*, 577 P.2d 748, 750 (Colo. 1978).[13]

Section I of the policy describes the "PERILS INSURED AGAINST" as well as the various exclusions from coverage.  (**Plf. Motion App.**, Exh. A at 12.)  Coverages A and B are addressed to the home and "other structures," respectively, and insure against "direct physical loss to the property" other than as specifically enumerated under the "Exclusions" subsection.  (*See id.*, Exh. A at 12-14, 16-17.)  Coverage C details the coverages and exclusions for personal property and insures for "direct physical loss" caused by any of a number of specifically enumerated "perils."  (*See id.*, Exh. A at 14.)  Among the perils as to which Coverage C applies is physical loss caused by "Vandalism Or Malicious Mischief."  (*Id.*, Exh. A at 14 ¶ 8.)[14]  Those terms are not defined in the

---

[13]  Nevertheless, Nationwide's strained attempt to show that "vandalism" in the context of the policy actually excludes willful or intentional damage by reference to the theft or attempted theft provisions is throughly unconvincing.  *See Huizar*, 52 P.3d at 819 (strained constructions are not favored).

[14]  Coverage A of the policy *excludes* from coverage vandalism or malicious mischief "and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, *if the dwelling has been vacant for more than 30 consecutive days immediately before*

policy itself.  The court therefore must attempt to discern, if it can, their plain and ordinary meaning.

There is some, albeit scant, authority interpreting these terms under Colorado law.  In a slightly different context, the Tenth Circuit relied on the dictionary definition of vandalism:  "'willful or malicious destruction or defacement of public or private property.'"  ***Saiz v. Charter Oak Fire Insurance Co.***, 299 Fed. Appx. 836, 840 (10th Cir. 2008) (quoting Webster's Ninth New Collegiate Dictionary 1303 (1991)).  (***See also*** (Merriam-Webster, Dictionary, *vandalism, Definition* ("[W]illful or malicious destruction or defacement of public or private property." (available at:  https://www.merriam-webster.com/dictionary/vandalism) (last accessed:  April 9, 2023)).[15]  Similarly, in a case heard before him by consent of the parties, Magistrate Judge Hegarty defined vandalism or malicious mischief as "intent to damage or destroy property or intent to perform an act that demonstrates reckless disregard for an individual's property rights." ***Weingarten v. Auto-Owners Insurance Co.***, 2018 WL 582401 at *1 (D. Colo. Jan. 29, 2018).

The issue was addressed also in ***Herod v. Colorado Farm Bureau Mutual***

---

*the loss.*"  (**Plf. Motion App.**, Exh. A ¶ 2.c(4) at 13 (emphasis added).)

[15]  The word "vandalism" derives from the brief but memorable history of the Vandals, a tribe of Germanic people who were responsible for the sack of Rome in 455 C.E.  (***See*** Britannica, *Vandal, Germanic people*(available at:  https://www.britannica.com/topic/Vandal-Germanic-people) (last accessed: April 9, 2023).)  Given the Vandals' purported actions during that campaign, the term "vandalism" historically was associated with the wanton or senseless destruction of art and monuments.  ***See General Accident Fire & Life Assurance Corp. v. Azar***, 119 S.E.2d 82, 84 (Ga. App. 1961); ***Ducote v. U. S. Fidelity & Guaranty Co.***, 130 So.2d 649, 652 (La. 1961) ("Originally [vandalism] signified the barbaric and ruthless destruction or spoilation of something venerable, artistic, or beautiful; the word vandal is generally employed as meaning a ruthless plunderer.") (footnote omitted).  "The ancient connotations of 'vandalism' have given way, in modern usage of the term, to a very broad meaning of the word that includes the destruction of property generally."  ***Battishill v. Farmers Alliance Insurance Co.***, 127 P.3d 1111, 1114 (N.M. 2006) (internal quotation marks omitted).  ***See also Azar***, 119 S.E.2d at 84.

*Insurance Co.*, 928 P.2d 834 (Colo. App. 1996), where the Colorado Court of Appeals found no error in a jury instruction which read:

> Vandalism within a dwelling policy means the wilful and malicious destruction of property generally, and the destruction must have been intentional or in such reckless and wanton disregard of the rights of others as to be the equivalent of intent, and malice may be inferred from the act of destruction.

*Id.* at 836, 838.   Moreover, the court adopted the majority position that "malice" in this context may be inferred from the act of destruction itself, such that "intent to damage property can be presumed from circumstantial evidence of a deliberate act which ordinarily would cause such damage."  *Id.* at 837 (citing cases).  Thus malice "may be inferred from unjustifiable conduct."  *Id.* at 836-37.  *See also Roselli v. Royal Insurance Co. of America*, 538 N.Y.S.2d 898, 899 (N.Y. Sup. Ct. 1989) ("Malice . . . may be inferred from unjustifiable conduct.").  Stated differently, an act of vandalism is malicious when it is done intentionally and "in conscious or intentional disregard of the rights of others in the property."  *Grabowski v. Agricultural Insurance Co.*, 675 F.Supp. 279, 280 (E.D. Pa. 1987) (citing cases).  *See also Weingarten*, 2018 WL 582401 at *1; *Bowers v. Farmers Insurance Co.*, 991 P.2d 734, 737 (Wash. App. 2000); *Burgess Farms v. New Hampshire Insurance Group*, 702 P.2d 869, 874 (Idaho Ct. App. 1985); *King v. North River Insurance Co.*, 297 S.E.2d 637, 638 (S.C. 1982); Amendola, et al., *Vandalism or malicious mischief insurance*, 46 C.J.S. § 1554 (Nov. 2022).

When a tagger spray paints the side of a building or a mob throws bricks through a window during a riot, the intent to destroy property without justification is manifest.

13

The issue is far less clear in this circumstance, where the entire purpose of the contractor's presence on the premises was to demolish the kitchen so it could be renovated.  Although the court has found several cases from other jurisdictions analyzing whether the terms vandalism or malicious mischief can be interpreted to apply to this situation, those decisions either fail to provide any discernable legal analysis,[16]

---

[16] In *Bailey v. Battiest Construction Co.*, the insured maintained the contractor's actions in removing the building's ceiling joists, which allegedly resulted in the collapse of the structure, constituted vandalism under the policy of insurance.  809 So.2d 1118, 1119 (La. Ct. App. 2002).  The Louisiana court of appeals rejected this argument out of hand without further discussion:

> [A]n insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion.  With regard to the "vandalism" issue, we find that interpreting the particular facts of this case in such a way as to state that Battiest's actions constituted "vandalism" would indeed be absurd and unreasonable.  We are not persuaded by this argument's attempt to find liability with regard to the "vandalism" issue.  There is no merit to this argument.

*Id.* at 1122-23.

14

are not available for the court to review,[17] or are distinguishable on their facts.[18]

_____

[17] In an article, the author cites *James A. Storer v. Northern Assurance Co. of America*, which would appear to be directly on point.  As described in the article, in that case,

> the insured had hired a contractor to remove floor tiles, which subsequently were found to contain asbestos.  The sanding of the floor released asbestos fibers into the air, contaminating the house.  The insured attributed the cause of loss to the contractor's "malicious mischief."  The court rejected that argument, noting that "negligence, not malicious mischief, is implicated."  It held that the policy did not cover the claimed loss.

Jerry Provencher, *First-Party Claims with an Environmental Twist; Don't Abandon the Basics of First-Party Coverage*, 23 SUM. BRIEF 8, 32 & n.20 (Am. Bar Ass'n SUMMER 1994) (quoting *Storer*, slip op at 1 n.2, 6-8 (Mass Super Ct, Middlesex County, July 27, 1990)).  However, this opinion is not available online and it is not shown on the public docket for the case.  (*See* Massachusetts Trial Court, Electronic Case Access, *8981CV03104 Storer et al v Northern Assurance Co/America* (available at: https://www.masscourts.org/eservices/search.page.3.3?x=H7NtIkHIhkAae20lws3WM-o9DxprkKYnmqD6c YGXSXYN8HIThUl3oQoNLhilrS8QKQSFOckvWQ2c3Io5aldq5A) (last accessed:  April 9, 2023).)  The court therefore does not know what factors led the court to so conclude or what further rationale (if any) the court may have provided.

[18] In *Carson v. Allstate Indemnity Insurance*, a homeowner hired a contractor to repair a leaking roof.  The first crew on the job removed large sections of the roof but stopped when the homeowner protested.  A second crew quit, and although a third crew attempted to abate the problem, mold had developed already .  The homeowner filed a claim with his insurer after the contractor ultimately abandoned the job six months after beginning.  *Id.*, 2011 WL 13213982 at *1 (M.D. La. Oct. 5, 2011).  The homeowner argued "the work done on his house was so poorly done that it should amount to vandalism or malicious mischief."  *Id.* at *4.  The court found that proposition unsupportable on the evidence before it:

> Plaintiff [Carson] cannot pinpoint any such actions that demonstrate [the contractor's], or any of his crew's, intent to willfully destroy Carson's property.  An intentional tearing off of a portion of Carson's roof could possibly, on its own, be characterized as malicious action.  Such a circumstance may have shown an intent to destroy the roof as opposed to an aborted attempt at repair work, and would be helpful to bolster Plaintiff's position.  However, after the first crew took off the roof, a second crew was sent to the home for the purpose of framing a new section of roof where the original hole was made.  This is evidence of an intent to repair the leak, not unlawful conduct.  The parties entered into a contract, authorizing [the contractor] to what he believed was necessary to complete the task.  No direct or circumstantial evidence presented to the Court rises to the level of malice or vandalism.
>
> . . . .
>
> [T]he Court finds it would be absurd and unreasonable to . . . find a construction job could equate to vandalism, at least where the facts indicate that some effort at repair was made.

Nevertheless, based on the Colorado caselaw which defining these terms, it is at least certain the Kimballs must establish that Mr. Riviere's actions were taken with "malice," that is, that they were "unjustifiable." ***See Herod***, 928 P.2d at 837.  An act cannot be considered unjustifiable "where the party whose property is damaged acquiesces in the act that causes the damage." ***Quaker City Gun Club v. St. Paul Fire & Marine Insurance Co.***, 1986 WL 3561 at *4 (E.D. Pa. March 13, 1986).[19]  The evidence before me is contradictory on the question whether the Kimballs actually acquiesced in Mr. Riviere's actions in removing the floor.  Therefore I cannot yet determine as a matter of law whether coverage exists.

On the one hand, the entirety of the course of dealing between the Kimballs and Mr. Riviere, evidenced by the contemporaneous text messages they exchanged prior to, during, and after January 6, as well as the Kimballs' actions right up until the time – weeks after the floor had been removed – that asbestos was confirmed to be present, appear to indicate the Kimballs gave Mr. Riviere permission, at least implicitly, to remove the floor without obtaining a test, much less a permit, first.  From the outset, the Kimballs' appear to have willingly attempted to evade the requirement of an asbestos test by misstating the size of the renovation on their permit application.   Even before

---

***Id.*** at *5.

[19]  In ***Quaker City Gun Club***, the plaintiff received notice from the city to vacate its clubhouse by a date certain. 1986 WL 3561 at *4.  The city took possession of the premises after that date and began removing property belonging to the plaintiff, with its knowledge and cooperation.  ***Id.***  The property subsequently was demolished, and the plaintiff filed a claim under its insurance policy.  The court held the loss did not constitute vandalism or malicious mischief under the policy because "the City did not act in conscious, intentional or even reckless disregard of the rights of the [plaintiff]."  ***Id.***  (Although these terms were defined in the policy itself, the court found "[t]he definition in the policy is consistent with the plain and ordinary meaning of vandalism or malicious mischief."  ***Id.*** at *5.)

16

they submitted the application for a permit, and despite the provision in the parties'

contract stating that work would not proceed without all permits first being secured, the

Kimballs knowingly allowed Mr. Riviere to proceed with other demolition and installation

projects in the home.  Thereafter, cognizant that the turnaround for permits was four to

six weeks, they nevertheless discussed plans for the ongoing renovation with Mr.

Riviere and allowed him access to their home knowing of his plan to continue demolition

of the kitchen on January 6.

Moreover, once the Kimballs' attempted deception was discovered, and Mr.

Turner inquired whether an asbestos test had to be submitted to the CDPHE for review,

it is difficult to fathom how the Kimballs could have been ignorant that a test alone was

insufficient.  Indeed, that information was available from the Arapahoe County website

detailing the permit application requirements, as well as from the product information

included on the Home Depot website for the very test kit the Kimballs proposed using.

Yet instead of clarifying the issue of when the test would be performed, the Kimballs

gave Mr. Riviere access to their home on January 6 with knowledge that his plan was to

continue the demolition and asked him to "take demo pics!!"  Their subsequent

questions about permits betray no sense of urgency as to the issue, and they continued

to work with Mr. Riviere on the remodel at least through January 23.[20]

---

[20]  All these considerations also potentially implicate the question whether the Kimballs waived a
contractual right to insist on the acquisition of permits as a precondition to Mr. Riviere's proceeding with
the work.  *See Avicanna Inc. v. Mewhinney*, 487 P.3d 1110, 1115 (Colo. App. 2019) ("A party waives a
contractual right . . . if the party acts inconsistently with the right and prejudice accrues to the other parties
to the contract."); *Venard v. Department of Corrections*, 72 P.3d 446, 450 (Colo. App. 2003) ("Waiver
may be express, or it may be implied when a party's actions manifest an intent to relinquish a right or
privilege.").  To the extent implicated, that question is one of fact which typically is inappropriate for
summary judgment. *See James H. Moore & Associates Realty, Inc. v. Arrowhead at Vail*, 892 P.2d
367, 372 (Colo. App. 1994).

Were these facts the only ones in evidence before me, I would have little hesitation in finding the Kimballs acquiesced in Mr. Riviere's decision to proceed with the demolition of the floor tile, thus precluding any suggestion that Mr. Riviere acted with the malice necessary to prove his actions constituted vandalism or malicious mischief. However, by their declarations, the Kimballs paint themselves as innocent victims of Mr. Riviere, who took advantage of their inexperience and pressured them to proceed without the necessary testing and permits and otherwise cut corners. They declare, under penalty of perjury, they believed Mr. Riviere would undertake asbestos testing prior to beginning demolition on January 6, 2020.[21] (**Plf. Motion App.**, Exhs. C ¶ 9 at 2-3 & D ¶ 10.). They also reference a January 2 voice mail from Mr. Kimball advising Mr. Riviere to "square up permitting questions before demo starts." (*Id.*, Exh c ¶ 9 at 3; Exh. D-2 at 44.)

These representations cannot be squared fully with the contemporaneous evidence. That the Kimballs seemed willing to lie about the size of the renovation (as well as other matters) on the permit application and allowed Mr. Riviere access to their home knowing that a permit would take four to six weeks to come through is at odds with their present claim that it was Mr. Riviere who pushed them to proceed without permits and cut corners. Moreover, having contractually assumed responsibility for obtaining all necessary permits themselves, the Kimballs appear to have been, at best, tragically incurious (if not wilfully obtuse) about the process of obtaining the asbestos

---

[21]  Of course, here again, testing for asbestos and obtaining a permit for the renovation are two separate issues; the latter presupposes the former, and results of an asbestos test are not instantaneous, even if Mr. Riviere had performed a test before taking up the floor.

permit (as versus an asbestos test) on which they now claim to have insisted.

Nevertheless, these discrepancies implicate the Kimballs' credibility.  Because my resolution of the legal question of coverage ultimately depends on determination of this factual issue, I cannot grant summary judgment to either party.[22]

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Plaintiffs' Partial Motion for Summary Judgment** [#59], filed September 28, 2022, is denied;

2.  That **Defendant's Motion for Partial Summary Judgment** [#60], filed September 28, 2022, is denied;

3.  That the parties shall immediately contact the chambers of the magistrate judge to arrange a further scheduling conference as soon as practicable;

4.  That within **three (3)** business days of the scheduling conference, counsel for plaintiffs shall initiate a joint email to Blackburn_Chambers@cod.uscourts.gov to schedule a combined Final Pretrial Conference and Trial Preparation Conference and the trial; and

5.  That the trial shall be scheduled to be completed on or before September 30, 2024.

---

[22]   However, and without prejudging the issue, the court is somewhat skeptical that the facts and arguments of this case present a viable basis for any claim of bad faith against Nationwide.  Given the novelty or the Kimballs' theory and the dearth of caselaw interpreting a vandalism or malicious mischief clause to apply to circumstances such as these, it is difficult to conceive that Nationwide denied benefits without a reasonable basis, *see* § 10-3-1115(1)(a), C.R.S.; *Williams v. Owners Insurance Co.*, 621 Fed. Appx. 914, 919 (10ᵗʰ Cir. 2015), much less that the insurer knew or recklessly disregarded the unreasonableness of its decision to deny coverage, *Travelers Insurance Co. v. Savio*, 706 P.2d 1258, 1275-76 (Colo. 1985).  *See also Masters v. Safeco Insurance Co. of America*, 2021 WL 4326269 at *5 (D. Colo. Sept. 23, 2021) ("[A]cting 'without a reasonable basis' has been construed to mean pursuing a groundless position that is not supported by credible evidence.").

Dated April 11, 2023, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge